UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>LUIS ARAÑA, D-13,<br><br>    Defendant. | Case No. 2:95-cr-80272-LJM-13<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER ON DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE [842]**

Luis Araña was sentenced to life in prison after a jury convicted him of serious drug and murder offenses, including arranging the killing of his former partner in a cocaine trafficking enterprise. Araña is 68 years old and has served 24 years of his sentence. His health is deteriorating and so he now seeks compassionate release from prison. For the following reasons, the motion is DENIED.

**I.**

In affirming Araña's convictions, the United States Court of Appeals for the Sixth Circuit provided a helpful summary of the underlying facts:

> [Luis] Araña, [Gilberto Felipe] Hernandez, and [Jose Alberto] Reyes were charged with various crimes directly and indirectly connected to the death of Gil Debasa, Araña's former partner in a drug dealing enterprise. Araña was the leader of a large-scale drug trafficking organization that moved cocaine between Miami and Detroit. Araña's partner was "Gallego" (Gil Debasa); the two had grown up in the same neighborhood of Havana, Cuba, and had been very close. Upon moving to the United States, Araña and Debasa began a cocaine importation ring. Araña sent cocaine from Miami to Detroit, and Debasa distributed the product in the Detroit area.

However, Debasa and Araña began to quarrel. Araña claims the dispute was about a woman; apparently a third party, named "Iran," made advances to Araña's girlfriend. Debasa was drawn into the conflict because both Iran and Araña were his friends. He told the two that he wished to remain neutral in the conflict. Araña thought that Debasa was taking sides with Iran, and became angry with him.

There were also disagreements about drug money. Debasa began to have trouble paying Araña for the cocaine that he had received. Araña stopped supplying Debasa with cocaine, because Debasa could not pay Araña for his previous shipments. Araña and Debasa eventually stopped working together; witnesses testified at trial that the money was the primary reason for the breakdown in the relationship.

Both Araña and Debasa continued to deal cocaine independently, although Debasa sold much less because his supply was disrupted by the dispute with Araña. Araña claimed Debasa owed him a substantial amount of money for cocaine based on their prior distribution relationship. Araña told Jose Balsce, an associate of the Araña cartel, that Debasa owed him $75,000, and told another witness that the amount was $46,000 plus a kilogram of cocaine.

Each defendant played a part in the slaying of Gil Debasa. The plot began when Araña offered Balsce $20,000 to murder Debasa. Balsce agreed, and Araña detailed Hernandez, a street-level drug dealer and enforcer, to help Balsce with the murder. Hernandez gave Balsce a gun, and drove the getaway car. On November 26, 1994, Balsce entered the V&L Bar in Detroit, and shot Debasa multiple times. Debasa was mortally wounded, but was able to identify Balsce as the killer before dying. Hernandez and Balsce then traveled to Chicago immediately after the murder. Defendant Reyes gave the two money for a hotel room once they reached Chicago, and Araña reimbursed Reyes for the expense. Reyes then paid Balsce for the murder on behalf of Araña with $10,000 and a half a kilogram of cocaine.

Reyes also handled many other aspects of the Araña operation's day-to-day affairs, and was central to the drug distribution conspiracy, although his involvement with the murder was tangential. Reyes was a drug courier for the Araña organization; he transported up to 30 kilograms of cocaine from Miami to Detroit at a time. . . .

Defendants were convicted on all counts, largely on the testimony of Balsce, who testified for the prosecution.

2

*United States v. Reyes*, 51 F. App'x 488, 490–91 (6th Cir. 2002).[1]

Araña was convicted of conspiracy to possess cocaine with intent to distribute (Count 1); murder-for-hire (Count 2); aiding and abetting an intentional killing (Count 3); and aiding and abetting a firearms murder in relation to a drug trafficking crime (Count 4). He was sentenced by now-retired District Judge Gerald E. Rosen in May of 1999 to four concurrent terms of life imprisonment. (ECF No. 792, PageID.313.) According to one of the Assistant United States Attorneys who prosecuted the case, Judge Rosen expressed his belief that a life sentence was the fair and appropriate sentence. (ECF No. 846, PageID.642.)

Araña says that, at age 68, he is a different person today. During his 24 years in prison, he has completed more than 50 programs, including on decision-making, job skills, self-management, handling stress, and avoiding recidivism. (ECF No. 842-2, PageID.649.) He also earned his GED. (*Id.*) He completed the drug program and the Challenge Program, which "is a cognitive-behavioral, residential treatment program" that provides "treatment to high security inmates with substance abuse problems and/or mental illnesses." (ECF No. 842-7.) He acknowledges some disciplinary incidents during his prison time—possessing a dangerous weapon in 1999, fighting in 2000, and possessing an unauthorized item in 2011—but notes that these violations all occurred roughly a decade or two ago.

More significantly, he says "his medical condition has deteriorated dramatically in the last year, as he suffered an attack of acute pancreatitis requiring emergency surgery. This has led to lasting debilitating pain and left him wheelchair-bound." (ECF No. 842, PageID.631.)

---

[1] In prior briefings, the Government explained that the trial evidence further revealed that Araña typically distributed 30–40 kilograms of cocaine per month, occasionally distributing 70 kilograms in a single transaction. (*See* ECF No. 767, PageID.213.)

He also receives treatment for infection prevention, high blood pressure, chronic anemia, obesity, enlarged prostate, kidney failure, and edema, and is prescribed over 20 medications. (*Id.*)

On October 24, 2019, Araña petitioned the administration at his prison (located in Victorville, California) for early release.

About five months later, in March 2020, he was examined by a staff doctor. The doctor noted many things that Araña was able to do with little or no assistance. (ECF No. 846, PageID.684.) But he ultimately concluded that Araña met the standard of Debilitated and Elderly with Medical Conditions. (*Id.*) So the warden at FCC Victorville sent paperwork to the Bureau of Prisons ("BOP") in Washington, D.C., for consideration of granting a sentence reduction.

The BOP denied the request. A doctor who serves as the medical director at the BOP Central Office noted that Araña is independent with all aspects of his Activities of Daily Living (ADLs) and Instrumental Activities of Daily Living (IADLs), including transfers, medication management, using handicapped transportation, and navigating the correctional environment. (ECF No. 846, PageID.685.) The medical director explained that Araña is able to self-propel his wheelchair and transfer in and out of it. (*Id.*) He can walk short distances (20–30 feet) safely without support. (*Id.*) And the medical director found that while Araña's medical conditions are considered chronic, they are stable at this time. (*Id.*) Thus, he concluded in mid-April 2020, that Araña does not currently meet the criteria for a reduction in sentence regarding elderly inmates with medical conditions. (*Id.*)

Prior to receiving this information, but more than 30 days after requesting relief from the warden, Araña filed this motion for compassionate release based on his age and medical

4

conditions. (ECF No. 842, PageID.633.) He asks the Court to reduce his sentence to time served and release him to live with his adult children. (*Id*.) After the filing, the global coronavirus pandemic hit, which Araña says also supports his immediate release. (ECF No. 847.) The Government acknowledges that Araña's medical condition is serious, but believes it is insufficient to warrant compassionate release at this time, especially given the BOP's ability to handle these medical issues and the nature and seriousness of the underlying offenses. (ECF No. 846, PageID.646.) The Court heard argument at a videoconference hearing on April 30, 2020.

## II.

Unless a specific exception applies, a "court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). The 2018 First Step Act (FSA) provides such an exception. Under the Act, "the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) . . . if it finds that extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . ." 18 U.S.C. § 3582(c)(1)(A) (internal numbering omitted).

### A.

The Government does not dispute that Araña has properly exhausted his administrative remedies. (ECF No. 846, PageID.647.) Nor does it strongly dispute that Araña's physical condition constitutes "extraordinary and compelling circumstances."

While Congress has not further defined "extraordinary and compelling," the current policy statement of the Sentencing Commission, adopted before the enactment of the FSA,

5

provides that extraordinary and compelling reasons for a sentence reduction exist where "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii). Another extraordinary and compelling circumstance exists where "[t]he defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process: and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13 cmt. n.1(B).

The Government believes that only the latter applies. (ECF No. 846, PageID.689.) Araña is 68 years old. He has served 24 years of his life sentence. It is debatable whether Araña's deteriorating medical condition as a result of his pancreatitis "meets the standard of Debilitated and Elderly with Medical Conditions, which is required for consideration for a reduction in sentence." (ECF No. 846, PageID.684.) At least one staff doctor at FCC Victorville concluded that his condition met the standard, while the BOP Medical Director disagreed. Thus, the Government believes this is a close call and even if Araña does not completely cross the medical threshold today, he is close.

The Government further believes that the critical issue in determining the propriety of compassionate release is not whether Araña meets the "extraordinary and compelling reasons" criteria listed in the Policy Statement. So the Court will assume he does.

**B.**

But, says the Government, "[m]eeting this qualification, standing alone, does not mandate release." (ECF No. 846, PageID.689.) While "the Court has discretion to reduce a sentence where the triggering predicate exists," it "must analyze all applicable § 3553(a)

6

factors, must determine that the defendant is not a danger (per [18 U.S.C.] § 3142(g)), and must find any reduction compliant with applicable Sentencing Commission policy statements." *United States v. Karr*, No. 17-CR-25, 2020 U.S. Dist. LEXIS 27149, at *8 (E.D. Ky. Feb. 18. 2020).

According to the Government, "[t]here is no reason to believe that the defendant poses a danger to others or a risk of recidivism if released, at this age and in this medical condition." (ECF No. 846, PageID.686.)

Thus, central to deciding Araña's motion is whether a sentence reduction is consistent with the factors set forth in 18 U.S.C. § 3553(a), to the extent they apply. *See United States v. Gotti*, 2020 U.S. Dist. LEXIS 8612, at *5 (S.D.N.Y. Jan. 15, 2020) ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances."). These factors require the Court to consider whether early release is consistent with (1) the nature and circumstances of Araña's offenses and personal history, (2) the need to promote respect for the law, deter future crimes, provide for Araña's rehabilitation, and protect the public, and (3) the need to avoid unwarranted sentence disparities among defendants with similar records. 18 U.S.C. § 3553(a).

According to the presentence report, while Araña had no prior criminal history, he was involved in drug trafficking for many years (at least 1989–1996) before getting caught. (PSR, ¶ 14.) In the early 1990s, the cocaine distribution grew to multiple kilogram transactions. (*Id*.) But the underlying offense involved more than just drug dealing. It also involved a murder

7

orchestrated by Araña. The Court agrees with the Government that "[i]t is not possible to [over]state the seriousness of the defendant's offense. The defendant was a Miami narco-trafficker who ordered a drug-related hit." (ECF No. 846, PageID.682.) True, in his present condition Araña poses little risk of engaging in the same behavior. And while in prison he has participated in programming to better his life and has "for the most part maintained clear conduct." (ECF No. 842, PageID.643.) He has also maintained strong relationships with his children, who have expressed a willingness to take care of him. (ECF No. 842, PageID.633.)

But the Court also has to consider a sentence that will promote respect for the law, provide just punishment, be an adequate deterrent, and avoid unwarranted sentencing disparities. At the time, the presiding judge believed that life was the appropriate sentence. To this day, Araña has never taken any responsibility or expressed any remorse for his conduct. Within the last two years, he has accused the prosecuting attorneys and his own trial counsel of misconduct. (*See* ECF No. 835, 836.) So, says the Government, "while Araña doesn't pose a danger to the community of getting back into the cocaine business," we "should not be tricking ourselves into thinking that he is some kind of remade person who has turned over a new leaf and is somehow different at the end of his life." (Draft Hr'g Tr., Apr. 30, 2020.) Also, the co-defendant who carried out the murder served 24 years in prison. While a 24-year sentence for Araña might seem like a non-disparate sentence, his co-defendant accepted responsibility, agreed to cooperate, and testified against the others at trial.

An analysis of the § 3553(a) factors presents another close call. The Government says, "This is not a prisoner deserving of special consideration and leniency from this court in a close case." (ECF No. 846, PageID.690.) Araña's brief says, "[s]uffering in prison, being away from his family during this devastating chapter of his life, having to struggle with his grievous

8

medical conditions while under the extreme stress of incarceration—all of these factors have conspired to make the time Mr. Araña has already served far harder than prison time otherwise would be." (ECF No. 842, PageID.642-643.)

What does the case law say? There are a number of cases addressing compassionate release for sick and elderly defendants serving life sentences that provide some guidance. But only a few arise out of underlying convictions involving murder. For example, in *United States v. Logan*, No. 96-cr-20, 2020 U.S. Dist. LEXIS 25222 (W.D. Ky. Feb. 13, 2020), the defendant was sentenced to life in prison for setting a hotel on fire, which ultimately killed four people and injured fifteen others. Although the defendant was 81 years old, had served more than 22 years of his sentence, and was suffering from serious health conditions (prostate cancer in remission, glaucoma, visual impairment in the left eye, type II diabetes, stage III chronic kidney disease, degenerative arthritis, folate deficiency, dysphasia, anemia, planta fascial fibromatosis, sciatica, arthropathy, reflux esophagitis, eczema, depression), the court found that reducing his sentence would minimize the nature and seriousness of the offense. *Id.* at \* 9; *cf. United States v. Gotti*, 02 CR 743-07, 2020 U.S. Dist. LEXIS 8612 (S.D.N.Y. Jan. 15, 2020) (denying compassionate release motion in the alternative based on 3553(a) factors because defendant, who was sentenced to 300 months' imprisonment consecutive to a 112-month sentence, had been the "Acting Boss of the Gambino Crime Family" and had "personally ordered the death of a Government cooperator"); *United States v. Webster*, No. 91-cr-138, 2020 U.S. Dist. LEXIS 23224 (E.D. Va. Feb. 10, 2020) (denying compassionate release motion of defendant with terminal cancer who had killed his estranged girlfriend and was sentenced to life in prison for murder in state court and a consecutive 10-year sentence in federal court for unlawful possession of the firearm.).

The court reached a different result in *United States v. Wong Chi Fai*, No. 93-CR-1340, 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019). There, the defendant was the leader of a New York gang. He was convicted of extortion and racketeering conspiracies and for his involvement in murders in furtherance of the conspiracies. At the time Wong filed for compassionate release, he was 65 years old and had served 26 years of his life term. He had no disciplinary violations. Three years prior to the filing, he was diagnosed with metastatic thyroid cancer. Multiple surgeries and radiation were not effective. A mass in his throat prevented him from eating solid foods. A BOP doctor diagnosed terminal cancer with an estimated 12-month life expectancy. In evaluating the § 3553(a) factors, the Court noted that "Mr. Wong has already served 26 years of his life sentence, the last three of which have been spent in medical purgatory," and so "[a]t this stage, to require Mr. Wong to serve out the rest of his life sentence would be 'greater than necessary to serve the purposes' of 18 U.S.C. § 3553(a)(2)." *Id*. at *12–13.

The reference to "medical purgatory" came, in part, from *United States v. McGraw*, No. 02-cr-00018, 2019 U.S. Dist. LEXIS 78370 (S.D. Ind. May 9, 2019). There, the court also granted compassionate release to the leader of a motorcycle gang who had served approximately 16 years of a life sentence for conspiracy to possess with intent to distribute methamphetamine. At the time, defendant was 72 years old and suffered from a variety of severe chronic illnesses, including diabetes, hyperlipidemia, emphysema, chronic kidney disease stage III, Hepatitis C and chronic pain. Applying the section 3553(a) factors, the court remarked that defendant "has served much of his sentence while seriously ill and in physical discomfort. This means that his sentence has been significantly more laborious than that served

by most inmates. It also means that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)." *Id*. at *15–16.

In granting compassionate release to another defendant sentenced to life, another court noted that the defendant, a major drug trafficker, had not engaged in any violence. *United States v. Mondaca*, No 89-CR-0655, 2020 U.S. Dist. LEXIS 37483 (S.D Cal. Mar. 3, 2020). The defendant was 77 years old, had served at least 10 years of his term of imprisonment, and as a result of serious deterioration in his physical and mental health had become suicidal and "increasingly vulnerable to victimization within the correctional facility." *Id*. at *8–9. The court found that the nature and circumstances of the offense charged did not reveal a propensity for violence or danger to others. The court stated that "although [d]efendant's crime involves controlled substances and the relevant conduct attributed to [d]efendant preceding the conviction reveals a deeply entrenched drug trafficker, neither violence nor weapons has ever been noted." *Id*. at * 10.

Araña's situation is materially different than Wong's, McGraw's, and Mondaca's. In addition to large scale drug-trafficking, this case involves the ultimate violence—the taking of a human life. That distinguishes Araña's conduct from McGraw's and Mondaca's. And while it is undoubtedly true that Araña's health has deteriorated significantly in the past year due to his pancreatitis, he is not suffering from a terminal illness, nor has he spent years of his sentence while seriously ill and in physical discomfort. That makes his situation different than Wong's. At this time, the record does not support that "his sentence has been significantly more laborious than that served by most inmates." *McGraw*, 2019 U.S. Dist. LEXIS 78370, at * 15–16. Lastly, it is beyond dispute that the coronavirus pandemic poses a heightened risk to those in custody and with other serious medical conditions. So Araña is justifiably concerned.

11

But he is presently housed at a facility that does not appear to have any inmates who have tested positive for COVID-19. And the BOP has been managing Araña's treatment. They have also expressed a willingness to reevaluate a request for compassionate release if "there is evidence of further disease or deterioration in the prisoner's condition." (ECF No.846, PageID.686.)

### III.

Thus, although the Court sympathizes with Araña's current medical condition, it finds that, on balance, the applicable § 3553(a) factors do not support Araña's request for compassionate release at this time. The motion is DENIED without prejudice to refiling should there be significant deterioration in Araña's condition.

SO ORDERED.

Dated: May 7, 2020

                                                 s/Laurie J. Michelson
                                                 LAURIE J. MICHELSON
                                                 UNITED STATES DISTRICT JUDGE