UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                  CR. NO. 95-80272

v.

                                  HON. LAURIE J. MICHELSON

LUIS NADRAZO ARAÑA,

        Defendant.
_____/

**RENEWED MOTION FOR
COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)**

      Luis Araña renews his motion for compassionate release. Four months ago, this Court denied Araña's motion, but since then, there have been at least three important developments that warrant renewed consideration.

      *First,* COVID-19 is now seriously affecting Araña's facility, Victorville Medium I. Right now, it is the BOP facility with *highest level of prisoner infections*, with 308 prisoners contracting the virus, and 169 active cases. The first incarcerated person at Victorville Medium 1 died today. He was just 50 years old.

      *Second,* since that time, counsel has learned that, shortly after the last round of briefing, but before the Court issued its opinion, Araña returned to the hospital and was diagnosed with additional serious health problems, including serious water collection in his lungs.

1

*Third,* over this summer, a robust body of case law regarding compassionate release has developed, providing additional examples of people who have been released with similar offenses.

Araña is among the most vulnerable inmates. Even without consideration of the pandemic, the government did not seriously contest that his health condition presents "extraordinary and compelling" reasons for release. The government also recognizes that, he does not pose a "danger to others or a risk of recidivism if released, at this age and in this medical condition." (R. 846, Gov. Resp., PgID 686.)

Counsel consulted with government counsel, who indicated the government "will not dispute [Araña's] eligibility for a compassionate release." It also agrees "he does not pose a serious recidivism risk." But it is opposed to release for the reasons expressed in this Court's earlier opinion. For the reasons discussed in the attached brief, Araña respectfully renews his request for compassionate release.

Respectfully submitted,

*/s/ Benton C. Martin*
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, Michigan 48226
PHONE:  (313) 967-5832
EMAIL:   Benton_Martin@fd.org

Dated: August 21, 2020

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

LUIS NADRAZO ARAÑA,

        Defendant.
_____/

CR. NO. 95-80272

HON. LAURIE J. MICHELSON

**BRIEF IN SUPPORT OF RENEWED MOTION FOR
COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)(i)**

### I.  BACKGROUND

This Court's prior order describes the procedural history of this case. In 1999, District Judge Rosen sentenced Araña to a life sentence for offenses involving drug trafficking and the murder-for-hire of a former partner in the cocaine trade. (R. 849, Order 5/7/20, PgID 702.) At the time of sentencing, a life sentence was mandatory under the sentencing guidelines.

In Fall 2019, Araña suffered an attack of acute pancreatitis requiring emergency surgery. (*Id.* at 704.) This condition left him wheelchair-bound. (*Id.*) He also suffered high blood pressure, chronic anemia, an enlarged prostate, and kidney failure. (*Id.* at 705.) He was previously obese, but his health condition has caused

1

him to lose significant weight. Below are pictures of Araña from before his surgery and after.

 

In October 2019, Araña asked leadership at his facility, FCI Victorville Medium I, for compassionate release. (R. 849, Order 5/7/20, PgID 705.) Five months later, in March 2020, before the pandemic started devastating the BOP, a staff doctor evaluated Araña and concluded he met the standard of Debilitated and Elderly with Medical Conditions. (*Id.*) The warden at Victorville sent paperwork to the central office of BOP to consider Araña for compassionate release. (*Id.*) The BOP denied the request on the basis that Araña can "self-propel his wheelchair and transfer in and out of it," can "walk short distances (20-30 feet) safely without support," and has chronic but stable medical conditions. (*Id.*)

In preparation for filing this motion, counsel obtain updated medical records for Araña. These records show that, at the same time this Court was considering his

2

prior motion, a day after counsel filed his reply, Araña returned to the hospital because of "severe abdominal distention with ascites"—that is, the accumulation of fluid in the abdomen. (Ex. 2, Med. R., 4/24/20.) Counsel did not have these records at the hearing. At the hospital, doctors including a pulmonologist had to remove water from Araña's lungs (called a pleural effusion). (*Id.*) He also had a needle inserted into his abdomen to remove excess liquid. (*Id.*) Imaging showed gallstones and the retention of excessive fluid.

Because of the excess liquid in his lungs, Araña had a chest tube installed, which was removed April 27, 2020. (Ex. 3, Med. R. 4/27/20.) He was discharged from the hospital on May 4, 2020, just three days before this Court's opinion. (Ex. 4, Med. R. 5/4/20.) Then, just days after this Court denied the motion, doctors diagnosed him with new ailments: abdomen distention, ascites (the accumulation of fluid in the peritoneal cavity), liver disease, and pneumonia. (Ex. 5, Medical Note, 5/10/20.) As of July 23, 2020, Araña's health problems include enlarged prostate, anemia, hypotension, hives, pneumonia, pleural effusion (water on his lungs), acid reflux, gastroenteritis, pancreatitis, tachycardia (rapid heartbeat), eye problems, and edema, among other things. (Ex. 6, Health Problems List.)

Araña's daughters also have raised a concern with counsel that he may not be able to fully express his health concerns to staff because he is not a native English

speaker. Because of this, he is not able to communicate all his symptoms and the care necessary for his basic needs.

## II. LEGAL STANDARD FOR COMPASSIONATE RELEASE

Section 3582(c)(1)(A)(i) permits sentencing judges to grant a reduction of sentence, after considering the § 3553(a) factors, if "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission."

As the BOP faces a rapidly escalating health crisis because of COVID-19, several courts in this district have recognized that the pandemic, for an offender with pre-existing health problems rendering them vulnerable to severe illness from COVID-19, is an extraordinary situation warranting release under § 3582(c)(1)(A)(i). *See, e.g., United States v. Jelinek,* No. 15-20312, 2020 WL 3833125, at *1 (E.D. Mich. July 8, 2020) (Parker, J.); *United States v. Nazzal,* No. 10-20392, 2020 WL 3077948, at *3 (E.D. Mich. June 10, 2020) (Lawson, J.); *United States v. Rahim,* No. 16-20433, 2020 WL 2604857, at *2 (E.D. Mich. May 21, 2020) (Edmunds, J.)*; United States v. Loyd,* No. CR 15-20394-1, 2020 WL 2572275 (E.D. Mich. May 21, 2020) (Tarnow, J.); *United States v. Agomuoh,* No. 16-20196, 2020 WL 2526113, at *1 (E.D. Mich. May 18, 2020) (Levy, J.); *United States v. Pomante,* No. 19-20316, 2020 WL 2513095 (E.D. Mich. May 15, 2020) (Hood, C.J.).

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

There is no exhaustion barrier in this case. Section 3582(c)(1)(A)(i) gives this Court authority to grant the requested relief after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility." Although Araña previously made a request to BOP and fully exhausted his remedies, to avoid any concern about him not raising his vulnerability to the pandemic as part of his request, counsel filed a renewed request with the warden more than 30 days ago. (Ex. 1, Renewed Letter to Warden.)

### IV. EXTRAORDINARY AND COMPELLING REASONS WARRANT RELEASE

This Court may order Araña released if "extraordinary and compelling" reasons exist. Araña's pre-existing health conditions, combined with the global pandemic, warrant compassionate release.

**A. Release is consistent with the policy statements.**

Araña's release is consistent with the Sentencing Commission's policy statements for three reasons. First, his health condition, combined with this pandemic, "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." U.S.S.G. § 1B1.13, cmt. n. 1(A)(ii). Courts have found release in these circumstances consistent with this policy statement. *See, e.g., United States v. Reddy,* No. 13-CR-20358, 2020 WL 2320093, at *5 (E.D. Mich. May 11, 2020);

5

*United States v. Amarrah,* No. 17-20464, 2020 WL 2220008, at *6 (E.D. Mich. May 7, 2020).

Second, as the government suggested in its earlier filing, release is consistent with U.S.S.G. § 1B1.13, cmt. n.1(B) because Araña (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years. (R. 846, Gov. Resp., PgID 689.)

Finally, Araña also presents "Other Reasons" under U.S.S.G. § 1B1.13, cmt. n. 1(D), warranting compassionate release, because the COVID-19 pandemic is devastating prison populations, and he is subject to particular danger because of health conditions. *See, e.g., Miller v. United States,* No. CR 16-20222-1, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020).

**B. Araña is at high risk of death or serious illness.**

Several factors about Araña's condition make him especially susceptible to dying from COVID-19. "The more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." CDC, COVID-19, *People of Any Age with Underlying Medical Conditions*, https://perma.cc/WT36H2VQ. Araña's rapid heartbeat raises a concern about heart disease, a CDC-recognized risk factor for severe outcomes from COVID-19. CDC, COVID-19, *Serious Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases*, https://perma.cc/DB9D-QDAH. His combination of serious problems like

6

pancreatitis, chronic anemia, and gastroenteritis and colitis have left him weak, likely with a less robust immune system than even other prisoners of his same age.

On top of this, Araña's age, the water on his lungs, and his pneumonia render him particularly vulnerable to COVID-19 even if each was his sole risk factor.

*Age.* The older an individual is, the greater the risk from COVID-19. CDC, *Risk for Severe Illness Increases with Age*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/olderadults.html. At least one judge in this district has found that advanced age alone, for a 68-year-old person convicted of a violent offense, presents an "extraordinary and compelling" reason for release, even without active COVID-19 cases at the facility. *United States v. Williams*, No. 15-20462, *2020 WL 4040706*, at *3 (E.D. Mich. July 17, 2020) (granting release to 68-year-old serial bank robber). Likewise, Araña's age alone puts him at seriously increased risk of death and warrants a time-served sentence.

*Pleural effusions.* Because COVID-19 is a respiratory illness, multiple "district courts have found claims of pleural effusion in combination with other medical conditions sufficient to grant release." *United States v. Galaz*, No. 15-CR-02559-GPC, 2020 WL 4569125, at *5 (S.D. Cal. Aug. 7, 2020) (granting release to a 33-year-old with pleural effusion and collecting cases); *United States v. Hunt*, No. 18-20037, 2020 WL 2395222, at *2, 6 (E.D. Mich. May 12, 2020) (finding "extraordinary and compelling" reasons for release where Defendant's health

conditions involved pleural effusion and cardiac complications causing him to have acute respiratory distress). This disease puts Araña at particular risk.

*Pneumonia.* As of February 20, 2020, Araña is diagnosed, and continues to be diagnosed, with "unspecified bacterial pneumonia." (Ex. 6, Medical Problems List.) This condition again shows the vulnerability of Araña's lungs, the very organ COVID-19 attacks. Other courts gave taken prisoners' bouts of pneumonia into particular account when granting compassionate release. *See, e.g., United States v. Panton*, No. 89 CR. 346 (LAP), 2020 WL 4505915, at *8 (S.D.N.Y. Aug. 4, 2020); *United States v. Israel*, No. 95-00314-CR, 2020 WL 4362258, at *4 (S.D. Fla. July 29, 2020); *United States v. Cassidy*, No. 17-CR-116S, 2020 WL 2465078, at *7 (W.D.N.Y. May 13, 2020); *United States v. Norris*, No. 7:19-CR-36-BO-2, 2020 WL 2110640, at *2 (E.D.N.C. Apr. 30, 2020).

**C. Conditions at Victorville Medium I warrant release.**

At the time this Court denied Araña's first motion, it acknowledged that Araña was justifiably concerned about the coronavirus pandemic. (R. 849, Order, PgID 712.) But it explained that Victorville Medium I, at that time, did not appear to have any inmates who tested positive for COVID-19. (*Id.* at 713.)

That is no longer true. As of the date of this filing, Victorville Medium I has the highest number of active infections of any BOP facility. Overall, 262 prisoners have contracted the virus there, with 127 active cases. https://www.bop.gov/

8

coronavirus/. Eleven staff members are positive for disease. At the greater Victorville complex, which has a USP and another Medium facility, an additional 13 inmates are sick, and 23 staff.

Further, on August 21, 2020, the first inmate died of COVID-19 at Victorville Medium I. Norman Duncan was sentenced in this district for premeditated murder. He was only 50 years old. He was serving a 37-year sentence.

Troublingly, Victorville Medium I seems on track to experiencing a surge of infections similar to FCI Seagoville in Texas. On June 20, Seagoville had just two confirmed COVID-cases among its staff. By July 23, 1,259 inmates had the virus, 1 inmate had died, and 19 staff members either had or recovered from the virus. Now, more than 1,300 prisoners at the facility have contracted the virus, and 3 died. The facility houses only 1,752 inmates (including the camp), meaning an infection rate of 77% despite having months to prepare and knowing the virus had breached prison walls. Even now, the prison still has 38 active cases. Given the apparent rapid rise in cases at Victorville, Araña is more at risk than ever of dying in prison.

## V. THE § 3553(A) FACTORS FAVOR RELEASE

In its prior order, this Court acknowledged that Araña has participated in significant programming to better his life while in custody and has "maintained strong relationships with his children, who have expressed a willingness to take care of him." (R. 849, Order, PgID 709.) This Court called the analysis of the § 3553(a)

9

factors a "close call." (*Id.*) The Court thus turned to case law, reviewing other decisions involving compassionate-release requests for people sentence to life. The Court found Araña's situation "materially different" from other cases granting release in these circumstances because it involved murder, and because he had not been subjected to the same severity of illness as in *United States v. Wong Chi Fai*, No. 93-CR-1340, 2019 U.S. Dist. LEXIS 126774 (E.D.N.Y. July 30, 2019). (R. 849, Order, PgID 710–12.)

### A. New case law favors release.

Case law has rapidly developed this summer in the wake of the COVID-19 pandemic, and several new decisions should cast new light on this Court's § 3553(a) analysis, ultimately favoring release.

First, in *United States v. Gluzman*, No. 7:96-CR-323 (LJL), 2020 WL 4233049 (S.D.N.Y. July 23, 2020), the Court reduced a life sentence of Rita Gluzman for the brutal murder of her husband. Gluzman plotted with her cousin to murder her husband, and they did so by waiting at his apartment armed with weapons and striking him until he died. *Id.* at *2. Gluzman herself wielded an axe and hammer. *Id.* After the murder, the cousin cut Gluzman's husband into pieces, and Gluzman instructed him on how to dispose of the body parts. *Id.* When Gluzman was discovered, she appeared to be preparing escape on an international flight. *Id.*

10

Nonetheless, the Court granted compassionate release, during this pandemic, after Gluzman served 24 years of her life sentence. *Id.* at *3 (S.D.N.Y. July 23, 2020). Gluzman was 71 years old, had early Parkinson's that, similar to Araña, left her unable to walk long distances and using a wheelchair. *Id.* at *4. She also suffered a series of strokes. *Id.* at *3. The brother of the victim and Gluzman's own son both wrote to the court to oppose granting release. *Id.* at *7–8. The court agreed that the crime was "abhorrent," and the court was granting Gluzman the opportunity for freedom she denied her husband. *Id.* at *18. But the court noted that, as with Araña, the sentence was handed down when a lifetime sentence was mandatory under the guidelines, and that, taking an individualized view, the 24-year sentence was "sufficient" but not "greater than necessary." *Id.* at *19.

Araña has been incarcerated for the same length of time as Gluzman. This sentence is the equivalent of more than 28 years once "good time" credit is taken into account. As in *Gluzman*, this sentence is sufficient for the purposes of sentencing in light of Araña's dire health status.

This Court also should look at *United States v. Tidwell*, No. CR 94-353, 2020 WL 4504448, at *1 (E.D. Pa. Aug. 5, 2020). Tyrone Tidwell ran a largescale drug distribution network and was convicted of drug trafficking and two counts of murder in furtherance of a continuing criminal enterprise. *Id.* Tidwell was 62 years old, and suffering prostate cancer, hepatitis C, and hypertension, with a year-long life

11

expectancy. *Id.* The government disputed he had a terminal illness. *Id.* at *5. Recognizing that the BOP cannot adequately protect vulnerable prisoners during the pandemic, the Court granted release. *Id.* at *6. As to the § 3553(a) factors, the court noted that Tidwell's crime was extremely violent, and he had a history of assaults. *Id.* at *7. But he had taken 34 educational courses, and had a minimal, nonviolent disciplinary record. *Id.* at *8. Further, the court found that the lengthy sentence already served, 25 years, adequately promoted respect for the law and served as just punishment. *Id.*

Araña's evidence of rehabilitation is as strong, if not stronger, than Tidwell's. He has completed more than 50 programs, including the in-depth Challenge Program for violent offenders. (Ex. 9, Progress Report, at 1–2.) He earned his GED and finished drug education. (*Id.* at 2.) Before his rapid deterioration, he worked in a UNICOR factory program. (*Id.*) He also has a minimal, nonviolent disciplinary record. (*Id.* at 2.) And he has the strong support of his children.

Another case to consider, although it did not involve a life sentence, is *United States v. Champagne,* No. 4:97-CR-089, 2020 WL 3472911, at *1 (D.N.D. June 25, 2020). Ambrose Champagne was sentenced to 360 months in 1998 for felon in possession of ammunition and one count of assault resulting in serious bodily injury. *Id.* He had prior convictions for first degree murder, assault with a dangerous weapon, and other offenses. *Id.* When granted release, he was 77, and the court

12

recognized that, after serving 23 years, Champagne was not the same person that he was at sentencing. *Id.* at *5. He was no longer a danger to the community, and he had "few serious disciplinary issues" in custody. *Id.* The court thus found release warranted, despite Champagne's "troubling criminal history."

This Court also noted its view that Araña has not accepted responsibility for his offense. On this point, Araña points the court to *United States v. Bailey*, No. 1:94-cr-00481, Dkt. 188, Order, PgID 215 (N.D. Ill. July 24, 2019). Richard Bailey received a 30-year sentence for an extensive racketeering scheme, with a finding by the judge at sentencing that he "committed additional offenses related to murder." *Id.* In his pro se motion for release, Bailey maintained his innocence, and even pointed to other people he argued were guilty for the murder. *Id.,* Dkt. 174, Mtn., PgID 49. The government opposed release, as it does here, based largely on the seriousness of the offense and Bailey's "continued denial of any involvement in the most serious of those offenses." *Id.*, Dkt. 188, Order, PgID 215. Nevertheless, in light of Bailey's institutional adjustment, disciplinary infractions, age, and time already served, the court granted compassionate release. *Id.*

A final relevant decision is *United States v. Warren*, No. 3:95-CR-00147-01, 2020 WL 3036011 (S.D.W. Va. June 5, 2020). In *Warren*, is the court granted a sentence reduction under the First Step Act because of the lowered sentence for crack cocaine. *Warren* is useful guidance because, at the time of sentencing, in 1996,

13

the district court had determined that the Robert Warren "had directed the murder of a potential witness in exchange for forgiving the drug debt of the man who admitted to shooting the victim." *Id.* at *2. He received a life sentence, and the government opposed any reduction in part of the basis of that finding. *Id.*

The court acknowledged the case presented a close call. *Id.* at *3. Warren led a significant drug-trafficking organization and was found responsible for directing the murder of a young woman, believed to be a potential witness, who had little personal involvement in the drug organization. *Id.* But Warren "did not have extensive criminal history prior to this offense, has not committed any serious infractions since his incarceration, and has served approximately 25 years of his sentence." *Id.* The same can said of Araña. In *Warren,* the court ultimately reduced the sentence to time served, and Araña asks for the same.

### B. The other sentencing factors favor release.

As noted, in denying release, this Court emphasized that Araña appeared to have not accepted responsibility. (R. 849, Order, PgID 709.) But in a new letter from his daughter Issa, she explains how he "has always expressed if he can go back to time he would take the deal and allow us to be part of it." (Ex. 7, Issa Madrazo Letter.) Araña regrets his actions, and he has worked to better himself in custody, as shown by his completion of serious programming like the Challenge Program.

14

Araña's other daughter, Oilda Madrazo, also submits a new letter. She explains that her father's health appears to be deteriorating as he has said he does not feel physically strong enough to visit him. (Ex. 8, Oilda Madrazo Letter.) She has not seen her dad for eight months. (*Id.*) This is a frightening time to be away from any elderly loved one, but especially one incarcerated in a prison, where people are particularly at risk from this virus.

At least 116 federal prisoners have died from this disease, and the disease has put unprecedented strain on the BOP. Notably, Araña is not at a medical facility. As another court in this district has explained: "Robust health systems outside of prison have been overwhelmed by the current pandemic, so much more so is the strain on an already under resourced BOP facility that is not designed to provide acute medical care *en masse*." *Snell v. United States*, No. CR 16-20222-6, 2020 WL 2850038, at *2 (E.D. Mich. June 2, 2020) (granting release to prisoner receiving care for spina bifida). Indeed, the medical resources available to BOP staff "are now being funneled to COVID-19 patients, leaving inmates with chronic conditions, like [the defendant], more vulnerable to deterioration or infection. *Id.*

BOP's policies regarding COVID-19 have been disastrous. The agency propelled the virus by refusing to grant paid administrative leave to sick corrections officers—forcing them to use scant sick-leave if they felt unwell. *See Chun v. Edge*, No. 20-CV-1590, ECF No. 91-1 ¶ 4 (E.D.N.Y. May 11, 2020) (Decl. of Anthony

15

Sanon). Staff worry "they won't get promotions or will experience other negative job effects (retaliation)" if they stay home. *Id.* ¶ 5.

BOP's policies also promoted viral spread in other ways. In response to the pandemic, "BOP started placing people believed to have COVID-19 in solitary confinement cells called the Special Management Unit or Special Housing Unit ('SHU'). This is not medical isolation; rather, it is essentially punitive solitary confinement." *Hallinen v. Carvajal*, No. 20-hc-2088, ECF No. 1 ¶ 72(c) (May 26, 2020). Rather than report symptoms, many would rather suffer silently in their bunks alone, afraid reporting means they would die in a solitary cell before anyone noticed. This problem is further amplified for Araña because of his language barrier.

Further, the BOP's staff screening is comprised of nothing more than "self-reporting and temperature checks." *See* BOP, [BOP Implementing Modified Operations](). Because the BOP does not test employees, and because testing of inmates in BOP facilities is not universal, the confirmed active cases likely underrepresent the true number of cases. Staff members must be ill enough to, on their own accord, get a COVID test. This is concerning given that "[t]he average time from exposure to symptom onset is 5 days[.]" W. Joose Wiersinga, et al., [*Pathophysiology, Transmission, Diagnosis, and Treatment of Coronavirus Disease 2019 (COVID-19)*](), JAMA (July 10, 2020).

16

Luis Araña faces dire risks if he remains incarcerated. He is not dangerous and has demonstrated rehabilitation. This Court should grant his immediate release. He is not opposed to this Court imposing home confinement for whatever length of time it deems necessary.

## CONCLUSION

Araña asks this Court to grant his motion for compassionate release, reduce his sentence to time served, and order his immediate release to live with his family.

Respectfully submitted,

*/s/ Benton C. Martin*
FEDERAL COMMUNITY DEFENDER
613 Abbott St., Suite 500
Detroit, Michigan 48226
PHONE:  (313) 967-5832
EMAIL:   Benton_Martin@fd.org

Dated: August 21, 2020

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                              CR. NO. 95-80272

v.

                              HON. LAURIE J. MICHELSON

LUIS NADRAZO ARAÑA,

        Defendant.
                          /

## CERTIFICATE OF SERVICE

I certify that I submitted this filing on the date indicated above using the CM/ECF system, which will send notification to opposing counsel.

                                        */s/ Benton C. Martin*
                                        FEDERAL COMMUNITY DEFENDER
                                        613 Abbott St., Suite 500
                                        Detroit, Michigan 48226
                                        PHONE: (313) 967-5832
                                        EMAIL: Benton_Martin@fd.org

Dated: August 21, 2020